

U.S. Department of Justice

Matthew M. Graves
United States Attorney

*District of Columbia*

---

*Patrick Henry Building*
*601 D St., N.W.*
*Washington, D.C. 20530*

December 15, 2023

Justin Dillon, Esq.
Tony Miles, Esq.
KaiserDillon PLLC
1099 14th St. N.W.
8th Floor West
Washington, D.C. 20005

VIA ELECTRONIC MAIL

      Re:    *United States v. Douglas Watts*

Dear Messrs. Dillon and Miles:

      With this letter, I am conveying the details of the government's offer of a Deferred Prosecution Agreement ("DPA" or "Agreement") to your client, Douglas Watts ("your client"), in connection with an investigation into your client's role in running an entity known as Yemen Watch, LLC, also known as Yemen Crisis Watch ("YCW"). The government has determined that the interests of the United States and the public, as well as your client's interests, will be best served by deferring prosecution of this case.

## Criminal Information and Acceptance of Responsibility

      Your client acknowledges and agrees that the U.S. Attorney's Office for the District of Columbia and the National Security Division of the U.S. Department of Justice (collectively, "the Office") will file the attached three-count criminal Information in the U.S. District Court for the District of Columbia, charging your client with False Statements to the FBI, in violation of 18 U.S.C. § 1001(a)(2); and Failure to Register Under the Foreign Agents Registration Act ("FARA"), in violation of 22 U.S.C. §§ 612(a) and 618(a)(1). In so doing, your client: (a) knowingly waives his right to indictment on these charges, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the U.S. Constitution, 18 U.S.C. §§ 3161-3174, and Federal Rule of Criminal Procedure 48(b); and (b) knowingly waives, for purposes of this Agreement and

for the purpose of any charges by the United States arising out of the conduct described in the attached Statement of Facts, any objection with respect to venue and consents to the filing of the Information, as provided under the terms of this Agreement, in the U.S. District Court for the District of Columbia.

Your client admits, accepts, and acknowledges that he is responsible under U.S. law as charged in the Information and as set forth in the Statement of Facts attached hereto as Exhibit A and incorporated by reference into this DPA, and that the allegations described in the Information and the facts described in Exhibit A are true and accurate. Should the Office pursue the prosecution that is deferred by this Agreement, your client stipulates to the admissibility of the Statement of Facts in any proceeding, including any trial, guilty plea, or sentencing proceeding, and will not contradict anything in the Statement of Facts at any such proceeding.

## Payment of Monetary Penalty

The Office and your client agree that, based on the factors set forth in 18 U.S.C. § 3572(a), and 18 U.S.C. § 3571(d), a fine of $25,000 is an appropriate fine in this case. Your client agrees to pay a fine in the amount of $25,000 to the U.S. Treasury based on the following payment schedule: $5,000 on acceptance of this Agreement and $20,000 by no later than two weeks before the expiration of this DPA. Your client and the Office agree that this fine is appropriate given the facts and circumstances of this case, including the nature and seriousness of your client's conduct. The $25,000 is final and shall not be refunded. Your client shall pay the fine plus any associated transfer fees according to the payment schedule pursuant to payment instructions provided by the Office in its sole discretion.

## Conditional Release from Liability

Subject to the terms of this DPA, the Office agrees that, except as provided in this Agreement, it will not bring any criminal or civil case against your client relating to any of the conduct described in the Statement of Facts, attached hereto as Exhibit A, or the Information filed pursuant to this Agreement. The Office, however, may use any information related to the conduct described in Exhibit A against your client: (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code. This DPA does not provide any protection against prosecution for any future conduct by your client.

## Deferred Prosecution

By signing this Agreement, your client admits to the conduct described in the Statement of Facts attached hereto as Exhibit A, agrees that the government could prove that the conduct violated the provisions of the statutes, and acknowledges responsibility for his conduct. The period of deferred prosecution may be administered under the supervision of the U.S. Pretrial Services Agency ("Pretrial Services") and an assigned Pretrial Services Officer. Once this Agreement is

executed by all parties, the Office agrees that prosecution of your client shall be deferred for a period of 12 months from the date the Court imposes the agreed-upon conditions of pretrial release, subject to the terms below, and provided your client abides by all the conditions of this DPA.

Once approved by the Court, the conditions listed here may be altered by consent of the parties, with approval by the Court.

### Conditions of Deferred Prosecution

By signing this DPA, your client agrees to be bound by its conditions of deferred prosecution. Specifically, your client shall:

- Not engage in any conduct that would require registration under FARA, 22 U.S.C. §§ 611-618 for a period not to exceed 12 months from the date the parties sign this Agreement;

- File an accurate and complete registration under FARA for the conduct described in the attached Statement of Facts based on instructions provided by the Office;

- Pay the Fine Amount pursuant to the schedule detailed above; and

- Comply with the terms of the Court's Order of Release.

If, upon completion of your client's period of deferred prosecution, the Office verifies that your client has complied with all the conditions of deferred prosecution set forth above, the Office will move to dismiss the Information with prejudice within two months of receiving this report. The Office further agrees not to file charges in the future against your client based on the conduct described in this Agreement, the Information, and Exhibit A.

In the District of Columbia, Pretrial Services is located at 633 Indiana Avenue, N.W., Suite 120, Washington, D.C. 20004-2902. Your client's supervision may continue to be supervised by a Pretrial Services office in New York. By executing this Deferred Prosecution Agreement, the defendant acknowledges that supervision of his period of deferred prosecution may be transferred to another Judicial District and/or Branch Office of Pretrial Services.

### Breach of Agreement

Should your client violate any of the conditions of this DPA, the Office may at any time: (1) revoke or modify any of the conditions of deferred prosecution; (2) lengthen the period of deferred prosecution; and/or (3) terminate deferred prosecution and reinitiate prosecution of this case. Any decision to revoke, modify, lengthen, or terminate deferred prosecution rests solely with the Office in its exclusive discretion. At the time the Office makes any such decision, it will furnish counsel for your client with written notice specifying the condition(s) of deferred prosecution that your client has violated and the reasons why deferred prosecution is being revoked, modified, lengthened, or terminated.

Your client understands that in the event he fails to comply with the terms of the deferred prosecution agreement, in any prosecution that is deferred by this Agreement, the government may offer all or part of the factual statements set forth above and in the attached Statement of Facts at any stage of the criminal proceeding for any purpose. Your client agrees that he shall assert no claim under the U.S. Constitution, any statute, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that such statement should be suppressed or is inadmissible. Your client understands that he is waiving any and all rights in the foregoing respects.

Should prosecution of your client for the charged offenses in this case be reinitiated by the Office, your client agrees that any period of delay in prosecution occasioned by this DPA shall be excluded from consideration as to any rights your client may have to a speedy indictment under the Sixth Amendment to the U.S. Constitution, the Speedy Trial Act (18 U.S.C. §§ 3161-3174),[1] the Federal Rules of Criminal Procedure (including Rule 48(b)), and/or the applicable statute of limitations. Any such prosecution relating to the conduct described in Exhibit A or relating to conduct known to the Office before this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against your client, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the end of its term (including any extensions), plus 90 days. By signing this Agreement, your client agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for a period equal to the term of this Agreement (including any extensions), plus 90 days.

Your client acknowledges that the Office has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if your client breaches this Agreement and this matter proceeds to prosecution, judgment, and sentencing. Your client further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

## Public Statements

Your client agrees that he shall not, through present or future attorneys, agents, or any other person authorized to speak for your client make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by your client set forth above or the facts described in Exhibit A. Any such contradictory statement shall constitute a breach of this Agreement, and your client shall then be subject to prosecution as set forth in this Agreement. If the Office

---

[1] The exclusion of time from any Speedy Trial Act calculations due to a deferred prosecution agreement is authorized by 18 U.S.C. § 3161(h)(2), which authorizes the exclusion of time when prosecution is delayed by the government pursuant to a written agreement with a defendant, with the approval of the Court, for the purpose of allowing the defendant to demonstrate his or her good conduct. *See United States v. Fokker Servs. B.V.*, 818 F.3d 733, 738 (D.C. Cir. 2016). Your client agrees to join in the government's motion for an exclusion of time under the Speedy Trial Act, 18 U.S.C. §§ 3161(h)(2) & (h)(7)(A).

determines that a public statement by your client, or by any person authorized to speak for your client, contradicts in whole or in part a statement contained in Exhibit A, the Office shall so notify your client, and your client may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification.

Your client agrees that if he issues a press release or holds any press conference in connection with this Agreement, your client shall first consult with the Office to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Office and your client; and (b) whether the Office has any objection to the release. Statements at any press conference concerning this matter shall not be inconsistent with such a press release.

**Complete Agreement**

      This Agreement sets forth all the terms of the agreement between your client and the Office. This Deferred Prosecution Agreement will be effective only upon signature of the undersigned Assistant United States Attorney, Department of Justice Trial Attorney, your client, and your client's counsel, and on approval by the Court of the agreed-upon terms of pretrial release.

      Sincerely,

      MATTHEW M. GRAVES
      UNITED STATES ATTORNEY

By:    */s/JOLIE F. ZIMMERMAN*
      JOLIE F. ZIMMERMAN
      Assistant United States Attorney
      United States Attorney's Office
      601 D Street, NW
      Washington, D.C. 20530
      (202) 252-7220
      Jolie.Zimmerman@usdoj.gov

      MATTHEW G. OLSEN
      ASSISTANT ATTORNEY GENERAL
      FOR NATIONAL SECURITY

By:    */s/EVAN N. TURGEON*
      EVAN N. TURGEON
      Chief, Foreign Agents Registration Act Unit
      Counterintelligence and Export Control Section
      Department of Justice
      National Security Division
      950 Pennsylvania Avenue, NW
      Washington, D.C. 20530
      (202) 353-0176
      evan.turgeon@usdoj.gov

## ACCEPTANCE

I, Douglas Watts, have read this Deferred Prosecution Agreement and have carefully reviewed it with my attorneys. I understand it, and I voluntarily, knowingly, and willfully agree to it, as well as to the conditions of my deferred prosecution, without force, threat, or coercion. No other promises or inducements have been made to me other than those contained in this letter. I am satisfied with the representation of my attorneys in this matter.


*Doug Watts*  12/22/2023
——————————————  ——————————
Douglas Watts  Date


## ATTORNEY'S ACKNOWLEDGMENT

I, Justin Dillon, Esquire, have carefully discussed every part of this Deferred Prosecution Agreement with my client, Douglas Watts. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.


*[signature]*  12/20/2023
——————————————  ——————————
Justin Dillon, Esquire  Date
Attorney for Douglas Watts

# ATTACHMENT A

## STATEMENT OF FACTS

At all relevant times, except as otherwise noted:

### Introduction

1. Defendant DOUGLAS WATTS ("WATTS") was a United States citizen who resided in New Jersey.

2. BARRY P. BENNETT ("BENNETT") was a United States citizen who resided in Virginia.

3. Avenue Strategies was a lobbying and consulting firm owned and run by BENNETT that operated through several legal entities, including Avenue Strategies Global, LLC.

4. Company A, referred to as "[Country C] Watch" and "[Country C] Crisis Watch," was an entity registered as a Delaware Limited Liability Company ("LLC") in September 2017. Company A ceased operations in or around January 2018 and was dissolved in or around May 2018. WATTS was the sole member listed on Company A's LLC Declaration.

5. In July 2017, Avenue Strategies entered into a contract to perform lobbying work for Country A; the contract was signed by BENNETT. Avenue Strategies, BENNETT, and others working on the contract for Country A registered with the Attorney General, as required by the Foreign Agents Registration Act ("FARA"), 22 U.S.C. §§ 611-618.

6. As directed by BENNETT and managed by WATTS, Company A ran a public relations campaign designed to cast one of Country A's rivals, Country B, in a negative light, and thereby to improve Country A's standing with the U.S. government relative to this rival.

9

7. Company A was operated by WATTS and was funded solely with funds that Avenue Strategies received from its contract with Country A. Company A received a total of approximately $773,000 from Avenue Strategies between September 2017 and January 2018.

8. While Company A was operational—from approximately September 2017 to January 2018—it engaged in a social media campaign, published opinion articles in newspapers, produced a documentary that was distributed through a national television network after Company A ceased operations, distributed flyers, sent direct e-mailings to American citizens, and lobbied Congress and former President Trump. Among other things, Company A encouraged American citizens to contact lawmakers and urge them to cease supporting Country B's intervention in Country C.

9. Neither WATTS nor Company A registered with the Attorney General under FARA. WATTS and Company A were required to register under FARA because their activities were for and in the interests of Country A and did not qualify for any applicable exemption from registration. In particular, WATTS's and Company A's activities on behalf of Country A did not qualify for FARA's humanitarian exemption because WATTS and Company A were not engaged "*only* … in the soliciting or collecting of funds and contributions within the United States to be used *only* for medical aid and assistance, or for food and clothing to relieve human suffering." 22 U.S.C. § 613(d)(3) (emphasis added). Rather, the primary purpose of the Company A campaign was to benefit Country A by raising awareness of the humanitarian crisis in Country C and thereby tarnish the reputation of Country B.

10. On February 11, 2020, WATTS told Federal Bureau of Investigation ("FBI") officers investigating Avenue Strategies and Company A that: (1) WATTS was not sure why Avenue Strategies created Company A to do this work and not do the work themselves; (2)

10

WATTS did not know Company A was beneficial to BENNETT's foreign clients; and (3) BENNETT did not tie Company A to Country A. These statements were false and materially misleading.

11. On February 27, 2020, WATTS told FBI officers investigating Avenue Strategies and Company A that: (1) WATTS did not believe that Company A was created to benefit or support Avenue Strategies' contract with Country A; (2) BENNETT never told WATTS that Company A was being operated on behalf of Country A; and (3) all of Company A's efforts were for humanitarian awareness purposes. These statements were false and materially misleading.

## The Foreign Agents Registration Act

12. The purpose of FARA is to prevent covert influence by foreign principals, such as Country A. Registrations and disclosures under FARA allow the U.S. government and the American people to evaluate the statements and activities of individuals who are serving as agents of foreign principals in light of their status as foreign agents. Among other things, registration documents that are required to be filed under FARA reveal the identity of the foreign principal on whose behalf a registrant performs services, the type of services the registrant provides the foreign principal, and the source and amount of compensation the registrant receives from the foreign principal. FARA registration documents are filed with the Department of Justice's FARA Registration Unit (the "FARA Unit") in Washington, D.C. The FARA Unit publishes these documents on its publicly available website, www.fara.gov.

13. In addition, FARA imposes ongoing disclosure requirements on registrants. Every six months, registrants are required to make supplemental filings with the FARA Unit. These filings require registrants to report, among other things, (1) any changes in the nature and method of performance of the registrant's agreement with the foreign principal, (2) all disbursements or

expenditures of money in connection with the registrant's activity on behalf of the foreign principal, and (3) any political activity engaged in on behalf of the foreign principal, including the relations, interests, and policies that the registrant sought to influence and the means employed to achieve these goals. In addition, FARA requires any informational materials disseminated to two or more persons in the United States for or in the interests of a foreign principal to be filed with the FARA Unit and to bear a conspicuous statement that they were distributed by the agent on behalf of the foreign principal. Once submitted to the FARA Unit, supplemental filings and informational materials are likewise published publicly on www.fara.gov.

14. FARA contains certain exemptions from registration. Relevant to the Company A campaign, FARA's humanitarian exemption provides:

> The requirements of section 612(a) of this title shall not apply to the following agents of foreign principals:
>
> **(d) Private and nonpolitical activities; solicitation of funds**
>
> Any person engaging or agreeing to engage only … (3) in the soliciting or collecting of funds and contributions within the United States to be used only for medical aid and assistance, or for food and clothing to relieve human suffering, if such solicitation or collection of funds and contributions is in accordance with and subject to the provisions of subchapter II of chapter 9 of this title, and such rules and regulations as may be prescribed thereunder.

22 U.S.C. § 613(d)(3).

<b><u>The Lobbying Campaign</u></b>

<i>Avenue Strategies Obtains a Contract with Country A</i>

15. On or about July 17, 2017, Avenue Strategies entered into a contract with the Embassy of Country A, located in Washington, D.C. The Embassy of Country A was part of the Country A's government, which was a "foreign principal," under FARA.

### *BENNETT Accuses a Country B Campaign of FARA Violations*

16. On or about August 17, 2017, before Company A was founded, WATTS wrote a draft press release as a favor to BENNETT. The press release highlighted a draft letter to DOJ's FARA Unit arguing that Country B Lobbyist should be required to register under FARA. The press release noted the absence of a FARA registration by Country B Lobbyist and explained that the FARA registration requirement was "established to ensure that the U.S. Government and the people of the United States are informed of information and propaganda distributed by foreign actors to influence US policy."

17. On or about August 20, 2017, Avenue Strategies delivered to the FARA Unit the press release and the FARA complaint letter signed by BENNETT. In the letter, BENNETT noted that Country B Lobbyist had not registered under FARA. BENNETT urged DOJ to investigate "the recent dissemination of 'informational materials' by [Country B Lobbyist]" to determine "the true nature of the relationship between" Country B and Country B Lobbyist, whether Country B Lobbyist was "subject to FARA's disclosure requirements" and "what federal laws might have been violated."

### *BENNETT Creates and WATTS Manages Company A for and in the Interests of Country A*

18. On or about August 28, 2017, BENNETT sent an email to WATTS. The email had no subject or message, but it attached the "[Country C] Watch" [Company A] document—on Avenue Strategies letterhead. The proposal identified WATTS as one of four people who would be "involved in the entity," while BENNETT would "manage the entire project quietly." The proposal stated that a budget of $350,000 per month would be sufficient for "spreading the word throughout US Policy Makers of the struggles going on in [Country C] at the hands of [Country B and Country D]."

DocuSign Envelope ID: AF41D175-67F5-4D05-927A-BB1B62870F71

19. On or about August 30, 2017, BENNETT emailed WATTS, stating, "Send me letter asap." In response, on or about the same day, WATTS emailed BENNETT a letter on Company A letterhead. Even though BENNETT had sent a description of Company A to WATTS two days earlier, the letter from WATTS to BENNETT purported to "introduce" BENNETT to Company A and its mission. Among other things, WATTS described Company A as an organization "committed to highlighting the suffering currently taking place in [Country C] resulting from [Country B/Country D] military intervention" and intending to "effectively communicate the atrocities taking place in [Country C] at the hands of [Country B/Country D]." In the letter, WATTS purported to request "a major contribution from Avenue of $1.5 million toward our operating budget, and $1.0 million to fund the associated strategic advertising program." WATTS explained that the money would be used to "reach opinion leaders and a public audience sympathetic to the plight of [Country C]." WATTS then wrote that he was "at [BENNETT's] disposal to further detail our plans and answer any questions you may have about our organization and program."

20. On or about September 6, 2017, BENNETT emailed WATTS and an attorney at Law Firm A ("Attorney A"). In the email, BENNETT stated, "[WATTS] meet [Attorney A]. [Attorney A]'s firm is setting up [Company A]. You will be the owner. Best if I don't. He will need your signature."

21. On or about September 6, 2017, WATTS caused Company A to be formed as a Delaware LLC. The company's limited liability company declaration was signed by WATTS, who was listed as its sole member.

22. On or about September 13, 2017, WATTS sent four proposed logos for Company A to BENNETT and asked for his preference. On or about the same day, BENNETT responded, "Want to see sick kids."

23. On or about September 14, 2017, WATTS sent an email to BENNETT and attached photos of what appear to be severely malnourished children. In the email, he wrote, "you want sick kids and misery?" BENNETT responded, "Wow. Coming to New York tonight to meet with [Country A official] in the morning. Will call after."

24. On or about September 15, 2017, at approximately 7:33 a.m., WATTS emailed BENNETT and attached a media plan for Company A. In the email, WATTS wrote, in part, "perhaps this will motivate ad funding action today. If we want this plan activated Monday, I need to transfer funds today."

25. On or about September 15, 2017, Avenue Strategies transferred $100,000 to Company A's bank account.

### *Company A Wages a Campaign to Influence the U.S. Government and the American Public*

26. On or about September 15, 2017, WATTS emailed BENNETT a link to a website for Company A, noting, "Placeholder page LIVE! Sick kids pics in queue when full [social media] site is posted."

27. On or about September 21, 2017, WATTS emailed BENNETT a memorandum that reported on "[social media company] Development and Reach" by Company A. The memorandum stated, in part, that BENNETT had asked about the impact of Company A's [social media company] program and its potential for growth through December 2017. WATTS reported that the [social media company] program had "launched just one week ago" but had already obtained

15

30,000 "likes" and had a "total reach" of 725,000 individuals and anticipated additional growth based on an investment of $20,000 per month.

28. On or about September 26, 2017, Avenue Strategies transferred $50,000 to Company A's bank account.

29. On or about September 28, 2017, BENNETT directed WATTS to post links to four news articles about the conditions in Country C to one of Company A's social media pages—one every four hours.

30. On or about October 5, 2017, WATTS emailed BENNETT the website address for Company A's website.

31. On or about October 16, 2017, Avenue Strategies transferred $100,000 to Company A's bank account.

32. On or about October 20, 2017, Avenue Strategies transferred $125,000 to Company A's bank account as "Payment for [TV Producer]."

33. On or about October 20, 2017, WATTS caused Company A to transfer $125,000 to TV Producer for a documentary-style program concerning "volunteer tourism" to be produced by TV Producer, described below in paragraph 38.

34. On or about October 27, 2017, WATTS sent BENNETT a one-page memorandum from on Company A letterhead. The memorandum reported on Company A's progress in generating social media followers, activity, and attention. That same day, Avenue Strategies transferred $101,700 to Company A's bank account.

35. On or about November 18, 2017, WATTS received an email about a briefing on Capitol Hill re: the Humanitarian Crisis in Country C.

DocuSign Envelope ID: AF41D175-67F5-4D05-927A-BB1B62870F71

36.     On or about November 21, 2017, a newspaper in Washington, D.C. published an opinion piece authored by a spokesperson for Company A (the "Spokesperson"). The Spokesperson had been hired by WATTS, who failed to disclose any information about the source of Company A's funding, telling Spokesperson that the donor wanted to remain anonymous. The opinion piece addressed the humanitarian crisis in Country C and described the impact on children, including that over 1,000 children had been killed and two million children were malnourished and at risk of dying. The opinion article encouraged political action by readers.

37.     On or about December 1, 2017, Avenue Strategies transferred $96,500 to Company A's bank account.

38.     On or before December 11, 2017, WATTS participated in an interview for a documentary-style program concerning "volunteer tourism" that was produced by TV Producer. In the final version of the program, which was distributed through a national public television network and published online shortly after Company A ceased operations, WATTS described the work of Company A as follows:

> Our organization . . . is all about raising awareness. We don't raise money for ourselves, we don't provide relief on the ground in [Country C]. We are trying to raise awareness of what this crisis is and the scope of it is.

WATTS emphasized that "raising awareness" meant "talking to your friends, talking to your representatives in Congress, making sure we elevate this issue to a point where everybody feels responsible to get involved [and] donate to one of the organizations that do provide relief."

39.     On or about December 14, 2017, Company A conducted a public briefing on Capitol Hill concerning the humanitarian crisis in Country C. WATTS and Spokesperson led the briefing, which Congressional staffers attended.

40. On or about December 15, 2017, Avenue Strategies transferred $125,000 to Company A's bank account.

41. On December 15, 2017, WATTS caused Company A to transfer $125,000 to TV Producer as the second payment for the documentary described above in paragraph 38. In total, TV Producer received $250,000 from Company A.

42. On or about December 25, 2017, Spokesperson published a second opinion article in a Washington, D.C. newspaper calling for an end to the blockade in Country C. The opinion article emphasized Country B's role in the matter, stating, in part, "[r]ecently, a dire situation has become worse. [Country B], which leads a military coalition that includes [Country D], [two other countries], and other regional countries, enforced a near-complete blockade of [Country C] last month." The opinion urged readers to "call on members of Congress" and the international community to exert pressure to end the war.

43. On or about January 16, 2018, Avenue Strategies transferred $75,000 to Company A's bank account.

44. On or about February 16, 2018, WATTS forwarded BENNETT a summary of the "[Social Media Company] Campaign" that had been conducted by Company A. The summary noted: 25.7 million "marketing impressions," 16.4 million "unique individuals reached," 148,000 [social media company] page followers, and 487,000 total "actions taken on page."

## WATTS False Statements to the FBI

45. On February 11, 2020, an FBI agent investigating Avenue Strategies and Company A and located in the District of Columbia interviewed WATTS by telephone. The FBI agent asked WATTS about his relationship with Company A, Avenue Strategies, and BENNETT. WATTS knowingly provided false and materially misleading statements to this FBI agent, namely that, (1)

WATTS was not sure why Avenue Strategies created Company A to do this work and not do the work themselves; (2) WATTS did not know Company A was beneficial to BENNETT's foreign clients; and (3) BENNETT did not tie Company A to Country A.

46. On February 27, 2020, an FBI agent investigating Avenue Strategies and Company A and located in the District of Columbia interviewed WATTS by telephone a second time (the call was initiated by WATTS). WATTS again knowingly provided false and materially misleading statements to this FBI agent, namely that, (1) WATTS was not aware that Company A was created to benefit or support Avenue Strategies' contract with Country A; (2) BENNETT never told WATTS that Company A was being done on behalf of Country A; and (3) all of Company A's efforts were for humanitarian awareness purposes.